IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DUHAMEL BROADCASTING ENTERPRISES, | ) ) ) | 8:03CV47 |
| Plaintiff, | ) ) | |
| vs. | ) ) | MEMORANDUM OPINION |
| STRUCTURAL SYSTEMS TECHNOLOGY, INC. | ) ) ) ) | |
| Defendant. | ) | |

This matter is before the court on plaintiff's oral motion for judgment as a matter of law in its favor on issues of liability at the close of evidence at the trial of this action on May 26, 2005. This Memorandum Opinion supplements findings made on the record.

This is an action for breach of contract and negligence in connection with the collapse of a broadcasting tower in Hemmingford, Nebraska on September 24, 2002.[1] The action was tried to a jury on May 23-26, 2005. At the close of the evidence, the court sustained plaintiff's motion for judgment as a matter of law on liability for breach of contract and negligence. The case was submitted to the jury on the issue of damages only.

**I. FACTS**

In the order on the pretrial conference, the parties stipulated and agreed that Duhamel Broadcasting Enterprises ("Duhamel Broadcasting"), is in the business of radio and television broadcasting. It is a South Dakota corporation with a principal place of business in Rapid City, South Dakota. Duhamel Broadcasting owned a tower

---

[1]Several other actions are also pending in this court in connection with the incident. *See Fireman's Fund v. Structural Systems Technology, Inc.*, No 03-CV-341, *Structural Systems Technology, Inc. v. National Fire and Marine Ins. Co.*, No. 04-CV-194, *Shultz v. Structural System Technology, Inc.,* No. 05-CV-22, *Sukalec v. Structural Systems Technology, Inc.* 05-CV-23.

approximately 1,965 feet tall near Hemingford, Nebraska.  William Duhamel is the President of Duhamel Broadcasting and has been since 1976.  Duhamel Broadcasting broadcasts its signal into the Nebraska Panhandle.

The Defendant, Structural Systems Technology, Inc. ("SST") is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business in McLean, Virginia.  In 1999, Duhamel Broadcasting hired SST to perform a rigorous computer structural analysis and evaluation of the Hemingford Tower in part to determine if the tower could hold a new digital antenna.  In 2001 and 2002, work was done on the Hemingford Tower to install horizontal and diagonal members, furnish new guy cables, and plumb the tower and adjust guy cable tensions.  Duhamel Broadcasting and SST executed a written agreement, dated February 2, 2001 for tower reinforcement and guy cable replacement on the Hemingford Tower.

In the agreement, SST agreed, in part, to design, furnish and install redundant horizontal members and stronger diagonal members on the Hemingford Tower.  The total project price for the work on the Hemingford Tower was $229,750, which included engineering, materials, labor and supervision.  On September 4, 2002, SST issued a purchase order to Mid-Central Tower Company ("Mid-Central"), to furnish all labor, tools and equipment required and to install horizontal redundant members and stronger diagonal members on the Hemingford Tower in exchange for a payment of $4,500.  The purchase order was accepted by Mid-Central.  On September 24, 2002, in the late morning, the Hemingford Tower collapsed.  On the day the Hemingford Tower collapsed a tower crew from Mid-Central was performing work on the tower.

The evidence adduced at trial established that Daniel Off and Lawrence Sukalec were working on the tower at the time it collapsed and both were killed. Testimony and exhibits admitted in evidence show that Duhamel Broadcasting contracted with SST to perform modifications to its tower and that SST, in turn, contracted with Mid-Central to perform certain work. See Trial Exhibits ("T. Ex.") 1 & 3. William Duhamel, the founder and President of Duhamel Broadcasting, testified that Duhamel Broadcasting had a business relationship with SST for many years and that SST generally performed inspections, maintenance and repairs on the tower. In 1999, SST conducted a "Rigorous Structural Analysis and Evaluation" of the tower in order to determine whether the tower could support the placement of a digital antenna on the tower. T. Ex. 2 at 5-7. SST recommended modification of the tower, including stronger diagonal bracing in Sections 10 and 47 of the tower. *Id.* at 7. Duhamel Broadcasting contracted with SST to perform the recommended modifications. T. Ex. 1. The contract provided in numbered paragraph 2 that SST would "design, furnish and install redundant horizontal guy members at mid-panel points in section 1 (top section) to reinforce tower legs" and in numbered paragraph 3 that SST would "design, furnish and install stronger diagonal members in Sections 10 and 47 (sections) to replace the existing diagonal members." T. Ex. 1 at 1. The total price of the contract was $229,750. *Id.* at 1-2. That price included engineering, materials, labor, and "supervision of construction." *Id.* at 2. Mr. Duhamel testified that he had no contact whatsoever with Mid-Central. Duhamel testified that before the tower collapsed he believed that employees of SST were performing all the work on the tower in connection with the digital antenna.

Fred Purdy, the President of SST testified that SST had inspected and repaired the tower since 1977. After it contracted with Duhamel Broadcasting to modify the tower, SST entered into a contract with Mid-Central to "furnish all labor, tools and equipment required to complete [the work set out in numbered paragraphs 2 and 3 of SST's contract with Duhamel Broadcasting]." T. Ex. 3 at 1. SST was to furnish the materials and plans. *Id.* The evidence shows that, although SST had originally intended to do the work, it had contracted with Mid-Central because it was cheaper. Purdy testified that SST had used Mid-Central to perform work in the past and had been satisfied with the work. Purdy also testified that he had observed the work of Mid-Central employee Lawrence Sukalec on an SST project in Rapid City, South Dakota, and that Sukalec knew how to perform that work and did not need training. Purdy testified that no representative of SST was on the site at the time of the tower's collapse. He testified that he provided no training or supervision to Sukalec. SST furnished the plans and instructions to Mid-Central and fabricated the diagonals that were to be installed. Purdy also testified that no safety manuals had been furnished to Mid-Central.

SST's "General Instructions for Tension Diagonal Replacement - Redundant Horizontal Replacement" require the use "a temporary system with adequate tension capacity" prior to removal of the existing diagonal. T. Ex. 4 at 1. The temporary system was to consist of two adequately sized (minimum 5/8" diameter) chokers tied around the tower legs, one above the top gusset plate and one below the bottom gusset plate, and a 3-ton Come-A-Long hooked securely to the eyes of the chokers at each end.[2] *Id.* The

---

[2] A "come-along" is a temporary structural support mechanism.

4

instructions further provided, "[r]emove and replace only one diagonal member at a time." *Id.* Purdy testified that it was "common practice and good engineering to use "come-alongs" when replacing diagonals. It is uncontroverted that no "come-alongs" were found in the wreckage. Purdy testified that "come-alongs" probably were not being used. Purdy opined that if the work had been done in a good and workmanlike manner, the tower would not have collapsed.

Monte Loos, a Duhamel Broadcasting employee, testified that he negotiated the contract with Fred Purdy. SST had also performed work on Duhamel's tower in Rapid City, South Dakota. Loos testified that he met Lawrence Sukalek, whom he assumed was an SST employee, at the Rapid City site. Loos was told that Sukalec was the crew chief on the projects and Loos delivered plans he received from SST to Sukalec in Rapid City and at Hemmingford. Loos testified that no one ever told him that Sukalec was not an SST employee prior to the collapse. Loos was informed of the tower's collapse on September 24, 2002, by a station manager. Loos then called Fred Purdy. Purdy did not tell him at that time that Sukalec was not an SST employee. Loos went to the scene and took photographs.

Expert testimony presented by both parties established that the cause of the collapse was the removal of bracing without temporary bracing. Madison Batt testified that the removal of bracing without temporary bracing deviated from the standard of care. He also testified that the use of a "come-along" instead of temporary bracing would be improper. Keveh Mehrnama, Vice-President of SST, also testified. He is in charge of engineering for SST. He testified that in his opinion there was a reasonable probability that two diagonals were removed simultaneously. The evidence also establishes that Mid-

5

Central employees Lawrence Sukalec and Daniel Goff were working on different sections of the tower when it collapsed.

## II. DISCUSSION

### A. Judgment as a Matter of Law

Whether judgment as a matter of law is appropriate "is judged by viewing the evidence in the light most favorable to the nonmoving party and giving it the benefit of all reasonable inferences from the evidence, but without assessing credibility." *Catipovic v. Peoples Comm. Heath Clinic, Inc.*, 401 F.3d 952, 956 (8th Cir. 2005). This court must: (1) consider the evidence in the light most favorable to the defendant; (2) assume that all conflicts were resolved in favor of defendant; (3) assume as proved all facts that defendant's evidence tended to prove; and (4) give defendant the benefit of all favorable inferences that may reasonably be drawn from the proved facts. *Id.* In addition, plaintiff's motion for directed verdict should not be sustained unless all the evidence points one way and is susceptible of no reasonable inferences sustaining defendant's position. *Id.*

### B. Agency relationship

A threshold issue involves whether the relationship between SST and Mid-Central can be regarded as an agency, or master/servant, relationship. One acting on behalf of another may do so either as an agent or an independent contractor. *Delicious Foods Co., Inc. v. Millard Warehouse, Inc.*, 507 N.W.2d 631, 636 (Neb. 1993). The general rule is that one who employs an independent contractor is not liable for the independent contractor's negligence. *Prochaska v. Douglas Co.* 619 N.W.2d 437, 646-47 (Neb. 2000). On the other hand, the law imputes to the principal or master responsibility for the negligent

acts of his or her agent or servant done in obedience to the express orders or directions of the master, or within the scope of the agent's authority or employment in the master's business, and if those acts cause injury to third persons, the law holds the principal or master liable therefor. *Plock v. Crossroads Joint Venture,* 239 Neb. 211, 475 N.W.2d 105 (1991), *overruled on other grounds, Hynes v. Hogan,* 251 Neb. 404, 558 N.W.2d 35 (1997); *see also Ashby v. First Data Resources, Inc.*, 497 N.W.2d 330, 334 (Neb. 1993)("Under the derivative liability that arises under the doctrine of respondeat superior, the negligent acts of an agent or servant done in obedience to the express orders or directions of the master are imputed to the principal or master, who is held liable").

The factors to be considered in distinguishing between an agent and an independent contractor are: (1) the extent of control which, by the agreement, the principal may exercise over the details of the work, (2) whether the agent is engaged in a distinct occupation or business, (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision, (4) the skill required in the particular occupation, (5) whether the principal or the agent supplies the instrumentalities, tools, and the place of work for the person doing the work, (6) the length of time for which the agent is engaged, (7) the method of payment, whether by the time or by the job, (8) whether the work is a part of the regular business of the principal, (9) whether the parties believe they are creating an agency relationship, and (10) whether the principal is or is not in business. *Delicious Foods Co., Inc. v. Millard Warehouse, Inc.*, 507 N.W.2d 631, 636 (Neb. 1993).

The control or right of control is the chief factor to be considered, although no one factor is conclusive. *Id.* (stating that "[t]he right of control, or the want of it, is generally

determinative of the relationship; for one who has no right of control over another ought not be required to answer for his acts, and, on the other hand, if one has such right of control he should be answerable"). The nature of the relationship can be determined from the terms of the contract, the character of the employment, and all the relevant facts and circumstances. *Id.* Whether or not the right of control exists is a question of fact for the jury when the facts are in dispute, or when more than one inference can be drawn therefrom. *Id.* However, the determination can be made as a matter of law in some circumstances. *Larson v. Hometown Communications,* 540 N.W.2d 339, 351-52 (Neb. 1995)(citing examples); *Eden v. Spaulding,* 218 Neb. 799, 359 N.W.2d 758 (1984) (holding that the trial court erred in submitting the question of agency to a jury and failing to find as a matter of law that the defendant trucker who made deliveries for a number of customers was an independent contractor).

The general rule in Nebraska that an owner or employer is not liable for the negligence of an independent contractor is subject to three exceptions: liability can be imputed if (1) the employer retains control of the work; (2) Nebraska common law creates a nondelegable duty; or (3) Nebraska statutes create a nondelegable duty. *Murdock V. United States*, 951 F.2d 907, 909 (8th Cir. 1991)(applying Nebraska law). *Erickson v. Monarch Indus.*, 216 Neb. 875, 347 N.W.2d 99, 105 (1984).

Thus, a general contractor remains liable for the negligence of the subcontractor "if he retains 'control' of the work--or if, by rule of law or statute, the duty to guard against the risk is made 'nondelegable'." *Erickson v. Monarch Indus., Inc.,* 347 N.W.2d 99, 104 (Neb. 1984) (stating, "[t]he doctrine, in short, says that the principal is negligent, and hence liable, because it has allowed the independent contractor to be negligent in performing the job.

8

There is a nondelegable duty to see that the work is done with the requisite degree of care; when the contractor fails in fulfilling its duty of care, the principal has breached its own precautionary duty"). A general contractor has a nondelegable duty to take special precautions if the activity in question is one which "the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken." *Ray v. Argos*, 612 N.W.2d at 249. If a general contractor hires an independent contractor to perform work which the general contractor should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, the general contractor may be liable for physical harm caused to employees of the subcontractor if the general contractor fails to exercise reasonable care to take such precautions, even though the general contractor has provided, in the contract or otherwise, that the subcontractor be responsible for such precautions. *Bellinger v. Omaha Pub. Power. Dist.*, 611 N.W.2d 123, 138 (Neb. 2000); *Parrish v. Omaha Pub. Power Dist.,* 242 Neb. 783, 496 N.W.2d 902 (1993) (adopting Restatement § 413).

The court finds that finds that reasonable people could not differ on the existence of a principal/agent relationship between Mid-States and Duhamel and that Mid-Central was SST's agent as a matter of law. The contract between SST and Mid-Central provides that SST maintained the right of control over Mid-Central's work. Moreover, application of the factors that show an agency relationship weigh favor of agency. Mid-Central held itself out to be SST's agent and SST did nothing to disabuse Duhamel Broadcasting of that notion. The contract between Duhamel Broadcasting and SST expressly provided that SST would supervise the construction. It cannot be seriously disputed that the work

9

undertaken on the tower is dangerous and that a reasonable contractor would foresee the possibility of harm or injury absent special precautions. The uncontroverted evidence establishes that such precautions were not taken. Accordingly, the court finds as a matter of law that the actions of Mid-Central and its employees can be imputed to SST, insofar as Duhamel Broadcasting's injuries are concerned.

### C. Contract and/or Negligence

This is an action for both breach of contract and negligence. Defendant objected to the preliminary jury instructions that were given to the jurors at the start of the trial. It contended that under Nebraska law, it was not appropriate to submit both issues to the jury. SST contended that Duhamel Broadcasting could proceed on only one theory. The court overruled defendant's objections.

Although the dividing line between breaches of contracts and torts is often dim and uncertain, the character of an action as one in tort or on contract is determined by the nature of the grievance, not by the form of the pleadings, with consideration being given to the facts which constitute the cause of action. *Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 304-05 (Neb. 1984). One may sue in tort when there has been negligence in the performance of a contract. *Id.* at 305. The injury in such a case results not from a breach of the contract but from negligence in the performance of it, for accompanying every contract is a common-law duty to perform with care, skill, reasonable expediency, and faithfulness the thing agreed to be done. *Id.* A negligent failure to observe any of these conditions is a tort as well as a breach of contract. *Id.*
Thus, contract actions, which arise from a breach of a duty imposed on one by an agreement, protect a plaintiff's interest in or right to performance of another's promises,

10

whereas tort actions, which arise from a breach of a duty imposed by law, protect a plaintiff's interest or right to be free from another's conduct which causes damage or loss to the plaintiff's person or property. *Thomas v. Countryside of Hastings, Inc.*, 524 N.W.2d 311, 314 (Neb. 1994); *L.J. Vontz Constr. Co. v. State*, 432 N.W.2d 7, 11 (Neb. 1988). In the present case, the plaintiff claims the defendant's actions both breached the contract and its express and implied warranties, and amounted to negligence that damaged their property. *See id.* With or without the contract, the defendant owed the plaintiffs the duty to properly modify the tower. *Id.*

Although an aggrieved party may choose a tort action rather than a contract action to remedy alleged negligence in the performance of a contract, the contract may nevertheless control the scope of a duty undertaken by the defendant. *Getzschman v. Miller Chemical Co.*, 443 N.W.2d 260, 270 (Neb. 1989) (noting that "[w]hile Nebraska law allows a party to base a claim for nonperformance of a contractual duty on either a contract or tort theory, in both cases the contract may determine the duty which has been breached with resultant liability"). In view of the foregoing, the court finds it appropriate to enter judgment on both the breach of contract claim and the negligence claim. The effect, however, is essentially inconsequential, since the damages are the same in any event.

### D.  Breach of Contract

Construction of a contract is generally a question of law. *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453, 456 (Neb. 1987). A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Boutilier v. Lincoln Benefit Life Ins. Co.*, 681 N.W.2d 746, 750 (Neb. 2004). In construing a contract, words are given their plain and ordinary

11

meaning as a reasonable person would understand them. *See Kreikemeier v. McIntosh*, 391 N.W.2d 563, 566 (Neb. 1986).

In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Day v. Toman*, 266 F.2d 831, 836 (8th Cir. 2001). A determination of whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Id.* The court must give the terms of the contract their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them. *Id.* "It is well recognized that, as a general rule, every contract for work or services includes an implied duty to perform the work or services skillfully, carefully, diligently, and in a workmanlike manner." *Pioneer Enterprises v. Edens*, 345 N.W.2d 16, 18 (Neb. 1984).

The evidence establishes as a matter of law that SST contractually assumed the responsibility of supervising the work. *See Simon v. OPPD*, 202 N.W.2d 157, 201 (Neb. 1972). Accordingly, the court finds that the evidence establishes the existence of a contract between Duhamel Broadcasting and SST and the breach of that contract. The court finds that uncontroverted evidence shows that SST can be held directly liable for its failure to supervise Mid-Central. Moreover, pursuant to the terms of the contracts at issue, SST is vicariously liable for the acts of Mid-Central as its agent, as discussed above. SST admits that had the work been performed in a workmanlike manner pursuant to the express and implied terms of the contract, the tower would not have collapsed.

### E. Negligence

The elements of a claim for negligence under Nebraska law are duty, breach of duty, causation and damages. *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 628 N.W.2d 697, 703 (2001); *Bargmann v. Soll Oil Co.*, 574 N.W.2d 478, 484 (Neb. 1998) ("[i]n order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty"). Whether a duty exists for actionable negligence is a question of law dependent upon the facts in a particular situation. *Desel v. City of Wood River*, 614 N.W.2d 313, 318 (Neb. 2000); *Ray v. Argos Corp.*, 612 N.W.2d 246, 248 (Neb. 2000). The existence of a duty involves the determination of whether a defendant is under any obligation for the benefit of a particular plaintiff; in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. *Desel,* 614 N.W.2d at 318. That standard is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances. *Bargmann v. Soll Oil Co.*, 574 N.W.2d 478, 484 (Neb. 1998) ("[o]rdinary negligence is defined as the doing of something that a reasonably careful person would not do under similar circumstances, or the failing to do something that a reasonably careful person would do under similar circumstances"). Negligence and the duty to use care do not exist in the abstract, but must be measured against a particular set of facts and circumstances. *Id.* In determining whether a duty exists, the court employs a risk-utility test, considering (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability

13

to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution. *Fu v. State,* 643 N.W.2d 659, 668 (Neb. 2002). Foreseeability alone is not dispositive. *Id.*

Once a court determines that a duty is owed by one party to another, it becomes necessary to define the scope and extent of the duty. *Cerny,* 628 N.W.2d at 703 ("[i]n other words, the necessary complement of duty—the standard of care—must be ascertained."). Determination of the appropriate standard of care is also a question of law. *Id.* The basic standard, i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances, is modified in circumstances that involve an alleged tort-feasor who "possesses special knowledge, skill, training, or experience pertaining to the conduct in question that is superior to that of the ordinary person," in which case the alleged tort-feasor is held to a standard consistent with his or her specialized knowledge, skill or other qualities. *Id.* at 703-04. The standard of care by a contractor is "the degree of caution a reasonably prudent contractor would have exercised in like circumstances." *Palmtag v. Gartner Const. Co.,* 513 N.W.2d 495, 503 (Neb. 1994).

Generally, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact. *Cerny,* 628 N.W.2d at 704. When reasonable persons can reach only one conclusion, however, questions of fact which would normally be submitted to a jury become questions of law for the court to decide. *See, e.g., Meacham v. McLeay*, 227 N.W.2d 829, 832 (Neb. 1975).

In this case the evidence establishes that the accident at issue was caused by the removal of diagonal bracing without either temporary bracing or the use of a "come-along." There is no dispute that SST had a duty under its contract with Duhamel Broadcasting to

14

supervise the installation of the diagonal supports in order to support a digital antenna. There is no dispute that it failed to do so. Similarly, uncontroverted evidence establishes that Mid-Central's actions, imputed to Duhamel, breached the standard of care.

### III. CONCLUSION

The court finds that plaintiff's motion for judgment as a matter of law on the issue of liability for breach of contract and negligence should be granted. An Order and Judgment in conformity with this Memorandum Opinion will issue this date.

DATED this 8th day of June, 2005.

BY THE COURT:

s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
UNITED STATES DISTRICT JUDGE